### Commonwealth *vs.* Gary Moorer.

Suffolk. March 10, 2000. - May 16, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Evidence,* Cross-examination, Bias of government witness. *Witness,* Bias, Cross-examination. *Practice, Criminal,* Argument by counsel, New trial.

At the trial of indictments for unarmed robbery and assault and battery, the judge erred in forbidding the defendant from cross-examining the victim on the issue of racial bias, fairly raised by the evidence, and from commenting on the subject in closing argument: the error prejudiced the presentation of the defense and a new trial was required. [547-548]

INDICTMENTS found and returned in the Superior Court Department on July 18, 1996.

The cases were tried before *Robert W. Banks,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for the defendant.

*Amanda Lovell,* Assistant District Attorney, for the Commonwealth.

SPINA, J. A jury found the defendant, Gary Moorer, guilty of unarmed robbery and assault and battery. On appeal the defendant argues that the judge's denial of any opportunity to cross-examine the victim as to racial bias and his denial of any opportunity to comment on the subject in closing argument is reversible error. We agree with the defendant and reverse his convictions.

The victim testified that he went to a Store 24 at the corner of Cambridge and Temple Streets in Boston shortly before 8 A.M. on July 6, 1996, to buy cigarettes. He took note of the defendant standing outside because "the cap [the defendant was wearing a Massachusetts Institute of Technology (MIT) cap] and the face didn't quite fit," and he had never before seen the defendant at that store, which the victim frequented. He

acknowledged that he did not think that someone who looked like the defendant would have gone to MIT. The victim said that after he made his purchase he walked back to his car. He sensed someone behind him, turned, and saw the defendant. As he reached for his car door the defendant pushed him against the car door and removed his wallet. A scuffle ensued. The victim claimed the defendant pushed him to the ground and fled with the wallet. The defendant denied striking the victim. The victim's shouts for help were heard by some fire fighters, who saw the defendant running and apprehended him.

The victim described the defendant as follows:

"He had a sloping forehead. The nose and lips and jaw were normal to negroid shape, slightly balding head, short curly hair. He had about two days' old growth beard and also with sagging eyelids."

He made no observations about the defendant's clothing, other than the MIT cap. In his testimony before the grand jury the victim described the defendant as "a black African," which he acknowledged at trial was a "slip of the tongue."

During counsel's opening statement the defendant conceded that he took the victim's wallet, but claimed it was the result of a pickpocket (larceny from the person, G. L. c. 266, § 25 [*b*]), not a robbery. The defense strategy was to show that the victim, a white man from Zimbabwe (formerly Rhodesia), exaggerated the circumstances of their encounter because of racial bias. The defendant is an African-American.

The strategy included cross-examination of the victim concerning two occasions before trial at which he overstated the amount stolen as $400, where the amount was actually $200. He first misstated the amount to police, but corrected himself the next day. The second time occurred before the grand jury, and he was corrected by the prosecutor. Counsel also elicited from the victim that his visit to the emergency room "a couple of days later or that night," about which he testified on direct examination, actually occurred on July 29. The visit shortly after the incident was "not official[]:"he had some friends who were emergency room doctors, and they gave him some painkillers. He could not recall their names. On July 29 he told hospital personnel that he did not remember being struck in the chest, but said he "could have been pushed against a car."

During cross-examination of the victim, counsel inquired about apartheid in Rhodesia,[1] where the victim grew up, and the victim's potential for racial bias, and the prosecutor objected and the objection was sustained. Counsel continued, but the judge called both lawyers to sidebar. Counsel explained his strategy and his basis for continuing. The judge "prohibited" him from further inquiry into the subject.

The judge interrupted counsel's closing argument[2] and said in front of the jury:

[1]See R. Oliver & J.D. Fage, A Short History of Africa 176, 188-189, 204-207 (6th ed. 1988, reprinted with 1995 postscript).

[2]"So let's look at [the victim]. He has, I suggest to you, exaggerated at every turn; hasn't he? Let's talk about his identification. And you're going to say, wait a minute. [The defendant's] not saying he's not the guy. What does the identification have to do with it? It has this to do with it, ladies and gentlemen. If he's going to exaggerate about that and exaggerate about other things that I'm going to talk about, can you rely on him to reach that high degree of certainty that the Judge is going to tell you about beyond a reasonable doubt and to a moral certainty? Are you going to be able to believe him?

"What did [the victim] tell you when he came in here . . . ? He said, on his way in to the Store 24, he stopped and noticed this man outside. And that's when he said, 'Yes, I noticed the face and the hat didn't go together.' Well, tell us about his facial features. He had — he told you, 'Oh, yes, he had a sloping forehead and he had a normal negroid shape, were his words, short curly hair and sloping eyelids.' He got a good look at him. He was able to give that kind of detailed description of that man that he saw standing outside the store. And he said that as he walked out and turned around, he recognized that same face to be the man that was following him.

"But, twelve days after the incident, he was asked, 'Did you get a look at him at all during the struggle? Not clearly, no. 'He was behind me all the time.' Well, did you get a good look at him at all? 'Yes, briefly, but mostly or particularly while he was running away.' And, every time at the grand jury when he was asked, what did he look like, what did his face look like, he said, 'He was a black gentleman.' He got the race and he got the sex. But that was all he could say.

"Now, sixteen months later, he's coming in here under oath and telling you that he had this great opportunity to observe and he really paid attention and he really got the details of the face down. Does that give you confidence that he's in here telling you the truth, or does that sound like someone who is exaggerating?

"He was asked at the grand jury or asked at the hearing in September, well, describe the face to us. Did you see the man in the MIT hat's face [*sic*]? That was the question. And he said, 'It was a typical African-American face. He seemed to me to be normal in every way.'

"Now, can you imagine for a second somebody saying that about a white person?"

"Look, you get off the racial card here. There is no racial card in this case, and I don't want you to broach it again, sir.

"I want to tell this jury, this is a court of law. Racial factors do not enter into the system of justice for white, for black, for Asian, or for any other group of people; and there is no issue in this case of that."

The judge denied counsel's request to be heard at sidebar, and later denied his request for a mistrial.

"The right of a criminal defendant to cross-examine a prosecution witness to show the witness's bias, and hence to challenge the witness's credibility, is well established in the common law, in the United States Constitution (Sixth Amendment), and in the Constitution of the Commonwealth (art. 12 of the Declaration of Rights)." *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995), and cases cited. "A judge may not restrict cross-examination of a material witness by foreclosing inquiry into a subject that could show bias or prejudice on the part of the witness." *Commonwealth* v. *Aguiar*, 400 Mass. 508, 513 (1987). "If, on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar all inquiry into the subject." *Commonwealth* v. *Tam Bui, supra* at 400. See *Commonwealth* v. *Henson*, 394 Mass. 584, 587 (1985). "A defendant who seeks to pursue a subject in an attempt to demonstrate bias must make a plausible showing that the circumstances existed on which the alleged bias is based." *Commonwealth* v. *Tam Bui, supra* at 401. See *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993).

The victim's comment that the defendant's face did not quite fit the MIT cap he was wearing created at least a remote possibility that he was racially biased. On that evidence, the defendant was entitled to inquire further.[3] Contrast *Commonwealth* v. *Johnson, ante* 535, 538-541 (2000) (evidence that

---

[3]Because of the potentially inflammatory nature of the cross-examination, counsel should have requested a sidebar conference to alert the judge as to his intention and the basis for his question. See *Commonwealth* v. *Johnson, ante* 535, 540 n.2 (2000). A judge may require an offer of proof or a voir dire of the subject to determine the scope of the cross-examination that will be permitted. Cf. *Commonwealth* v. *Rooney*, 365 Mass. 484, 496 (1974) ("The judge presiding over the trial of a case has the power to keep the examination of witnesses within the limits of common decency and fairness, and he has the

potential witness had been asked by Commonwealth's principal witness whether she dated black men insufficient to establish remote possibility of racial bias). The Commonwealth suggests that the judge's ruling went only to the form of the question, but our review of the record leads us to conclude otherwise. The judge made it abundantly clear that any inquiry into the subject of the victim's possible racial bias was off limits. That was error, based on this record.

We also conclude that the error prejudiced the defendant. While he need not show precisely what the victim would have disclosed had the judge permitted cross-examination on the subject of racial bias, he must show that something having "more than minimal value . . . might have been forthcoming." *Commonwealth* v. *Fordham*, 417 Mass. 10, 20 (1994). This threshold was met by the victim's admission that he did not think that someone who looked like the defendant would have gone to MIT. Bias was the glue of the defense, for without it, the victim's overstatements as to his injuries and the amount stolen easily could be explained, and were, by confusion, shock, and nervousness.

The error was compounded when the judge interrupted defense counsel's closing argument and instructed the jury that there were no racial factors in the case. Counsel was making a proper argument and drawing a fair inference from the evidence. See *Commonwealth* v. *Murchison*, 418 Mass. 58, 59 (1994). Contrast *Commonwealth* v. *Phoenix*, 409 Mass. 408, 425 (1991) (improper to impute racial animosity during prosecutor's argument without evidentiary support). Counsel had a basis to argue as he had. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring); *Commonwealth* v. *Cutty*, 47 Mass. App. Ct. 671, 675 (1999). Whether racial bias affected the victim's credibility was a matter for the jury, not the judge, to determine. *Commonwealth* v. *Murchison, supra* at 60. The judge's intervention effectively obliterated whatever salvage value had remained in the defense. The defendant is entitled to a new trial.[4]

*Judgments reversed.*

duty to exercise that power promptly and firmly when it becomes necessary to do so").

[4]We need not address the defendant's motion for a mistrial made after clos-

ing arguments. The defendant's argument that he is entitled to inquire as to racial bias without need of a good faith showing is without merit. See *Commonwealth* v. *Johnson, supra* at 538-541.