COMMONWEALTH *vs.* EDWARD KNIGHT.

Suffolk. April 5, 2002. - August 12, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Amendment of indictment or complaint, Assistance of counsel. *Witness,* Cross-examination, Bias, Credibility. *Evidence,* Prior consistent statement.

In a murder case, a Superior Court judge did not err in allowing the Commonwealth's motion to amend the indictment to change the date of the victim's death, where the change did not involve an essential element of the crime, did not result in prejudice to the defendant, and did not materially change the work of the grand jury. [491-494]

At a murder trial, the judge did not err in foreclosing the defendant's cross-examination of the Commonwealth's principal witness regarding the impact of a recent murder trial on her motivation to testify, where the line of questioning was minimally relevant but highly inflammatory, and where the jury were presented with sufficient evidence with which to assess the witness's bias and credibility. [494-496]

At a murder trial in which the defendant sought to impeach the testimony of the Commonwealth's principal witness by a claim of recent contrivance, the judge did not err in admitting in evidence the witness's prior consistent statement, made before the witness had an incentive to fabricate her testimony; further, the lack of a limiting instruction at the time of the testimony concerning the prior consistent statement was not error, where the judge properly and adequately instructed the jury on the limited use of prior consistent statements on other occasions. [496-499]

Defense counsel at a murder trial did not render ineffective assistance by failing to request an alibi instruction, where the instructions as given properly informed the jury of the Commonwealth's burden to prove that the defendant committed the crimes charged and was physically present at the scene of the crime [499]; or by failing to call a potential defense witness whose testimony was cumulative and whose credibility was subject to serious challenge [499-501].

A criminal defendant failed to demonstrate that his trial counsel rendered ineffective assistance by failing to pursue certain impeaching evidence, or in his cross-examination of the medical examiner regarding the time of the victim's death. [501-503]

INDICTMENTS found and returned in the Superior Court Department on December 31, 1996.

A motion to amend the indictment was heard by *Elizabeth B. Donovan,* J.; the cases were tried before *Barbara J. Rouse,* J., and a motion for a new trial, filed on July 21, 2000, was heard by her.

*Edward B. Gaffney* for the defendant.

*Jane A. Sullivan,* Assistant District Attorney, for the Commonwealth.

CORDY, J. Edward Knight appeals from his conviction of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder.[1] He also appeals from the denial of his motion for a new trial, which is now consolidated with his direct appeal. Knight claims the trial judge erred in (1) allowing the Commonwealth's motion to amend the indictment to change the date of the victim's death; (2) precluding the defendant's cross-examination of the Commonwealth's principal witness about the effect of the verdict in the criminal trial of Louise Woodward on the witness's decision to testify against Knight; and (3) admitting testimony of that same witness on direct examination to the effect that she had made prior consistent statements. Knight also claims that his trial counsel was constitutionally ineffective. For the reasons set forth below, we affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial.

1. *Facts.* We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. See *Commonwealth v. Fowler,* 431 Mass. 30, 31 (2000).

Pasquale Candelino was a sixty-one year old man who resided in the North End section of Boston. In the afternoon of Saturday, June 22, 1996, his body was found by his landlord in the bedroom of his apartment. The apartment had been "ransacked, drawers were open, doors, cabinet doors were open," and there

---

[1] Knight was also convicted of armed robbery. That indictment was placed on file with the defendant's consent and is not before us on appeal. *Commonwealth v. Johnson,* 435 Mass. 113, 115 n.2 (2001). The trial judge did not believe an additional sentence could be imposed because armed robbery was the underlying felony of the felony-murder. But see *Commonwealth v. Payne,* 426 Mass. 692, 702 (1998).

was blood on the floor and the walls of the bedroom and bloody fingerprints inside an open drawer.[2]

The medical examiner conducted an autopsy and determined that the victim died of multiple stab wounds to the neck.[3] The state of the body's decomposition was consistent with the injuries having been inflicted, and death having occurred, as early as the previous Wednesday, June 19, 1996.[4]

Knight and his girl friend, Betsy Kelley, were drug addicts who supported their habits principally by shoplifting. They had sold stolen goods to the victim in the past, and had also purchased pills from him. On Wednesday evening, June 19, 1996, sometime after 9 P.M., they were in the North End looking for money to buy drugs. Their normal hunting grounds, the malls, were closed. They saw the victim on the street, and Knight suggested they rob him. Kelley agreed. She approached the victim and asked if she could use the bathroom in his apartment. While Kelley was in the victim's apartment (and the victim was in his bedroom), Knight rang the door bell and Kelley let him in.

Knight hid behind the refrigerator in the kitchen. When the victim came out of the bedroom Knight attacked him, pushing him back into the bedroom where a struggle ensued. Kelley remained in the kitchen searching for drugs and money. Kelley heard the victim saying, "Eddie, what — what are you doing? What are you doing?," and "Eddie, no." She also heard Knight tell the victim "to shut the fuck up." After the struggle ended, "It was just quiet," and Kelley heard "drawers opening." When Knight came out of the bedroom, he had blood on his sneakers. Kelley and Knight put drugs and "stuff" from the victim's apartment into a black bag, then wiped the door knobs with their shirts as they were leaving. They went to a friend's apartment, where Knight told Kelley he had killed the victim.

Late in the evening of the next day, Thursday, June 20, 1996, Knight, Kelley, and two friends left for Florida on a bus that ar-

---

[2]These were not identifiable.

[3]The victim had been stabbed ten times in the neck.

[4]The body "was in an early state of decomposition with green/black discoloration of the right side of the head and chest," and "marbling of the skin and skin slippage and wrinkling of the forearms."

rived in Orlando on Saturday morning, June 22, 1996. Knight and Kelley returned separately to the Boston area the following week. After their return, they went to the Boston Public Library and looked for newspaper accounts of the murder. The articles they found reported that the police believed the murder to have occurred on Saturday, June 22, 1996, the day on which Knight and Kelley arrived in Florida. Knight told Kelley not to worry, because "they have the dates wrong."

In September, 1996, three detectives came looking for Kelley at her father's home where she was staying. Her father was not at home, and she did not answer the door. After the detectives left, Kelley telephoned her father and told him that she was in trouble and had been present when Knight had killed someone. Her father began arranging for a lawyer to represent her. Kelley's father drove her to a friend's house, and she told the friend what had happened in the victim's apartment on the night of the murder.

Knight was arrested on December 16, 1996, and was indicted on December 31, 1996, for murder in the first degree and armed robbery. The indictment stated that the victim died "on or about June 21, 1996." Kelley was also indicted and, as arranged by her lawyer, surrendered to the police on January 2, 1997. After being held in jail pending trial for more than one year, Kelley agreed to be interviewed by detectives and, in January, 1998, negotiated a plea agreement with the Commonwealth. The agreement required that she testify at Knight's trial and plead guilty to manslaughter. The Commonwealth agreed to recommend an eighteen-month sentence, guaranteeing Kelley's release from prison shortly after Knight's trial.

When Kelley was interviewed, she told the detectives that the victim had been robbed and killed on June 19, 1996, before she and Knight went to Florida. Thereafter, the Commonwealth moved to amend the indictment to change the date of the murder to "on or about June 19, 1996." After a hearing, the motion judge allowed the amendment over Knight's objection.

At trial, the Commonwealth relied primarily on Kelley's testimony to establish Knight's guilt. The Commonwealth also introduced evidence of a knife that police seized from Knight when he was arrested on unrelated charges on June 27, 1996,

five days after the victim's body was found. The medical examiner's testimony indicated that the knife was not inconsistent with the victim's wounds. The defense relied primarily on the testimony of six witnesses from the victim's neighborhood who testified that they had seen the victim at various locations on Thursday, June 20, and Friday, June 21, when the undisputed evidence demonstrated that Kelley and Knight were on a bus bound for Florida.[5] The defense contended that Kelley's testimony was a fabrication induced by the Commonwealth's offer of an eighteen-month sentence and by her fear of remaining in prison for life if she were convicted. The Commonwealth attempted to rebut this contention by calling the friend to whom Kelley had confided the details of the murder in September, 1996, long before her indictment, arrest, and incarceration.

Knight filed a timely notice of appeal from his conviction, and a motion for new trial.

2. *Discussion.*

a. *Motion to amend the indictment.* Knight asserts that the judge improperly allowed the Commonwealth's motion to amend the indictment to change the date of the victim's death. Knight preserved this issue at trial, and also raised it in his motion for a new trial.

Under Mass. R. Crim. P. 4 (d), 378 Mass. 849 (1979), "a judge may allow amendment of the form of a[n] . . . indictment if such amendment would not prejudice the defendant or the Commonwealth." Cases interpreting rule 4 (d) set forth two requirements for such amendments. First, the amendment must be a matter of form and not a matter of substance. See *Commonwealth* v. *Snow*, 269 Mass. 598, 606 (1930).[6] Second, even if the amendment is a matter of form, it must not result in prejudice. See *Commonwealth* v. *Hobbs*, 385 Mass. 863,

---

[5]The Commonwealth contended that these witnesses saw the victim often, and were simply mistaken with regard to when they last saw him.

[6]*Commonwealth* v. *Snow*, 269 Mass. 598 (1930), addressed G. L. c. 277, § 35A, which has since been repealed and replaced by Mass. R. Crim. P. 4 (d), 378 Mass. 849 (1979). Although the statute permitted only the prosecutor to move for amendment, rule 4 (d) allows either party to move for an amendment. Rule 4 (d) also allows the judge to initiate a motion to amend. See Reporters' Notes to Mass. R. Crim. P. 4 (d), Mass. Ann. Laws, Rules of Criminal Procedure at 34 (Lexis 1997).

870 n.8 (1982). The power of the court to allow amendment to an indictment also has constitutional constraints. Under art. 12 of the Declaration of Rights of the Massachusetts Constitution, "no one may be convicted of a crime punishable by a term in the State prison without first being indicted for that crime by a grand jury." *Commonwealth* v. *Barbosa*, 421 Mass. 547, 549 (1995). An amendment that "materially changes the work of the grand jury" interferes with that right. *Commonwealth* v. *Benjamin*, 358 Mass. 672, 679 (1971).

We first consider whether the amendment was a matter of form or substance. Matters of form are those that are "not essential to the description of the crime charged." *Commonwealth* v. *Snow*, *supra* at 606. "The time alleged for an offense is ordinarily treated as a matter of detail rather than substance." *Commonwealth* v. *Campiti*, 41 Mass. App. Ct. 43, 50 (1996). See G. L. c. 277, § 20 ("The time and place of the commission of the crime need not be alleged [in the indictment] unless it is an essential element thereof"). Although a date of death was included in the original indictment, it is not an essential element of the crime of murder. See *Commonwealth* v. *Wright*, 411 Mass. 678, 683 (1992) (amending date of murder alleged in indictment proper because change involved nonessential element of indictment); G. L. c. 265, § 1 (definition of murder does not include date of victim's death); G. L. c. 277, § 79 (form of murder indictment does not include date of victim's death). In fact, the Commonwealth could have proceeded on the original indictment and properly proved, without fear of dismissal based on variance of proof, that the murder occurred on June 19, a date that clearly comes within the original time frame of "on or about" June 21. See G. L. c. 277, §§ 20, 34, 35.[7]

One test for determining whether an amendment is a matter

---

[7]The rule that a crime must be "proved as charged," *Commonwealth* v. *Grasso*, 375 Mass. 138, 139 (1978), does not provide grounds for reversal "when the particular terms of the indictment from which the evidence . . . depart[s] were merely 'surplusage' — unnecessary to describe the crime — and did not mislead the defendant, confuse the jury, or raise the danger of retrial after acquittal." *Commonwealth* v. *Hobbs*, 385 Mass. 863, 870 (1982). Cf. *Commonwealth* v. *Sineiro*, 432 Mass. 735, 737, 738 (2000) (indictments stated that sexual assaults occurred " 'on divers dates and at divers times'

of form or one of substance is whether a conviction on the original indictment would bar the subsequent prosecution of the defendant based on the amended indictment. See *Commonwealth v. Snow, supra* at 609 (amendment to indictment for intent to extort money to change name of person threatened was change of substance that would not bar subsequent prosecution). If Knight had been tried for the murder of the victim based on the original indictment, there is no question that the Commonwealth would be barred from prosecuting him again for the murder of the same individual based on the amended indictment. See *id.* Conversely, Knight's conviction based on the amended indictment bars the Commonwealth from prosecuting him again based on the original indictment. The change of the date of the victim's death in the indictment was a change in form, not substance. See *Commonwealth v. Snow, supra.*

We next consider whether the amendment created prejudice to Knight. See *Commonwealth v. Hobbs, supra.* A defendant is not prejudiced by an amendment if the "language of the indictment inform[s] the [defendant] of the charge against him." *Commonwealth v. Murphy,* 415 Mass. 161, 165 (1993) (no prejudice from amendment changing "and" to "or" in bribery indictment). See *Commonwealth v. Parrotta,* 316 Mass. 307, 311 (1944) (amendment adding place of larceny not prejudicial when indictment, before and after amendment, "sufficiently apprised defendant of the stolen property which he was charged with receiving"). Here, both the original indictment and the amended indictment sufficiently informed Knight of the charge against him, the murder in the first degree of Pasquale Candelino. Although a defendant may be prejudiced if he makes the details of his alibi defense known to the prosecution before the amendment of the date of the crime, see *Commonwealth v. Atkinson,* 15 Mass. App. Ct. 200, 203 (1983), there is no evidence that Knight disclosed the details of his alibi defense to the Commonwealth. There was no prejudice.

Finally, we consider whether the amendment to the indictment materially changed the work of the grand jury. Knight as-

between August 29, 1986, and August 29, 1992," which did not bear on "central question before the jury concerning the credibility of the victims," and defendant did not assert that he would have conducted defense differently).

serts that the grand jury should have been allowed to "resolve the fundamental contradictions between the prosecution's new theory (that the victim was murdered on Wednesday night [June 19, 1996]) with the extensive evidence that the victim was last seen alive on Friday night [June 21, 1996]." However, the circumstances of the crime that were presented to the grand jury were substantially the same as the circumstances presented to the jury at trial.

Both the grand jury and the trial jury heard testimony that the body of the victim was found on Saturday, June 22, 1996. Both juries heard testimony that the victim was seen alive on Thursday, June 20, and Friday, June 21. With respect to Knight's involvement in the murder, the grand jury heard the testimony of Knight's jail cellmate,[8] to whom Knight had confided the details of the murder, and the testimony of Kelley's friend, to whom Kelley had also divulged the details of the murder. The fact that the principal evidence at trial was Kelley's testimony rather than Knight's cellmate's is of no consequence. The crime described to both juries was the same; it occurred in the same place, against the same victim, in the same manner, and by the same person. The work of the grand jury was not materially changed by the amendment to the indictment. *Commonwealth* v. *Gallo*, 2 Mass. App. Ct. 636, 639-640 (1974) (indictment "which remain[s] unchanged apart from the date and which [is] buttressed by the specifications which also remain[] substantially unchanged, provides a sufficient showing that the set of circumstances before the grand jury was indeed the same set of circumstances on which the conviction rests").

The allowance of the Commonwealth's motion to amend the indictment was not error.

b. *Exclusion of testimony about the Louise Woodward verdict.* Knight asserts that the judge improperly excluded testimony about the effect of the Louise Woodward verdict[9] on Kelley's decision to testify against him. Knight preserved this issue at trial, and also raised it in his motion for a new trial.

---

[8]Knight was arrested on unrelated charges later in the summer of 1996, after his return from Florida. Knight's cellmate did not testify at trial.

[9]Louise Woodward, a nineteen year old British au pair, was found guilty of murder in the second degree in the death of an eight month old child in her care. The trial judge subsequently reduced the jury's verdict to involuntary

On cross-examination, Knight's counsel attempted to question Kelley about the effect of the Woodward verdict on her decision to testify. The Commonwealth objected. At a bench conference, defense counsel claimed the similarities between Kelley and Woodward — both were nineteen years old and unfamiliar with the legal process — would show why even an innocent person would plead guilty rather than risk a trial.[10] The Commonwealth argued that this line of questioning would be "highly inappropriate" because "Woodward had been in the newspaper every single day" and "[c]ounsel could have asked anything he wanted about going to trial without having to throw Woodward into this thing." The Commonwealth also noted that "[e]very juror just smirked when" defense counsel referred to Woodward.

The judge ruled that this line of questioning was not warranted because the Woodward case was "very controversial" and "emotionally loaded in many different ways," and the defense had not made a strong enough showing of relevance. Defense counsel was then permitted, however, to inquire at length "as to [Kelley's] concerns and fears about conviction, about incarceration, and anything of that sort."

Knight now claims that the exclusion of this testimony violated his constitutional right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. Knight argues the inquiry was relevant to Kelley's credibility, and that cross-examination would have explained to the jury why an innocent person would choose to lie and implicate herself in a murder, rather than face trial and risk being wrongly convicted.

Although a judge may exclude evidence that is of little probative value, she may not bar all inquiry into a subject that could demonstrate a witness's bias. See *Commonwealth* v. *Aguiar*, 400 Mass. 508, 512, 513, 515 (1987) (defendant entitled to new trial when judge foreclosed all inquiry into "star witness's" true

_____

manslaughter, vacated her life sentence, and sentenced her to time served. See *Commonwealth* v. *Woodward*, 427 Mass. 659 (1998).

[10]Knight's counsel represented to the judge that Kelley's counsel had told him that Kelley made her decision to cooperate with the Commonwealth two days after the Woodward verdict in October, 1997.

motive for testifying, that defendant threatened to turn witness over to police for drug dealing). See also *Commonwealth* v. *Moorer*, 431 Mass. 544, 547 (2000). There are two factors to be weighed in determining "whether a defendant's constitutional right to cross-examine and thus to confront a witness against him has been denied because of an unreasonable limitation of cross-examination." *Commonwealth* v. *Miles*, 420 Mass. 67, 72 (1995). The first is the "materiality of the witness's direct testimony," and the second is the "degree of the restriction on cross-examination." *Id.* There is no question that Kelley's direct testimony was material to the Commonwealth's case because she provided the only first-hand account of the murder. The judge did not improperly limit the defense's cross-examination of Kelley, however, because the jury were presented with sufficient evidence with which to assess her bias and credibility. She was extensively cross-examined about her drug use, prior convictions of forgery, larceny, and fraud, her plea agreement with the Commonwealth, and her fears about being convicted of murder and incarcerated for life. Defense counsel also attempted to impeach Kelley by pointing out inconsistencies in her testimony and conflicts between Kelley's testimony and other evidence. In this context, we conclude that the judge's ruling excluding the minimally relevant but highly inflammatory line of questions about the Woodward verdict was not error.[11]

c. *Admission of prior consistent statements.* At trial, Kelley testified on direct examination that before she was arrested she told her father: "I was in big trouble, that I was there when Eddie killed someone"; and told a friend: "Eddie killed somebody

[11]Compare *Commonwealth* v. *Graziano*, 368 Mass. 325, 330 (1975), *S.C.*, 371 Mass. 596 (1976) (judge's limitation of cross-examination deemed to be "serious error" because "[t]he reliability and credibility of [the witness] [were] essential to the proof of the defendants' guilt"), with *Commonwealth* v. *LaVelle*, 414 Mass. 146, 154 (1993), quoting *Commonwealth* v. *Hicks*, 377 Mass. 1, 8 (1979) (no prejudice in limiting defense's cross-examination of Commonwealth's key witness, "because there was extensive inquiry into the witness's bias and credibility in general" and "the matter sought to be elicited [had] been sufficiently aired"), and *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979) (exclusion of specific inquiry into witness's suspended sentence not abuse of discretion where jury adequately exposed to witness's arrest, indictment, guilty plea, sentencing, and contact with law enforcement agents).

and that I was there, in the North End." Defense counsel did not object to this testimony at trial. Knight asserted in his motion for a new trial and on appeal that this testimony regarding prior consistent statements made by the witness was improperly admitted in evidence. There was no error.

A witness's prior statement that is consistent with his testimony at trial may be admitted if the witness's testimony at trial is "impeached by a claim of recent contrivance or inducement," *Commonwealth* v. *Rivera*, 430 Mass. 91, 99 (1999), and if the statement was "made before the witness had an incentive to fabricate testimony," *id.*[12] Even when admitted for this purpose, the prior statement is not admitted to prove the truth of the matter asserted. *Id.* at 100.

Knight cannot credibly contend that he did not intend to impeach Kelley's testimony at trial by claiming it was recently fabricated or the product of government inducement. Such a claim was one of the cornerstones of his defense. There remains, however, the question of timing. Kelley testified, albeit in cursory form, that she had made prior consistent statements to her father and her friend before defense counsel had attempted to impeach her testimony on cross-examination. This sequencing is not, however, determinative. The trial judge has "wide discretion in deciding whether the circumstances warrant the admission of a witness's prior consistent statements when [the witness] has been or will be impeached with an inconsistent statement." *Commonwealth* v. *Saarela*, 376 Mass. 720, 723 (1978) (prior consistent statements properly admitted on direct examination because claim of recent contrivance unavoidable). See *Commonwealth* v. *Martinez*, 425 Mass. 382, 397 (1997).

---

[12]See P.J. Liacos, Massachusetts Evidence § 6.16, at 340 (7th ed. 1999) ("In order to be admitted, it must be demonstrated that the statement was made prior to the intervention of the pernicious impulses or the motivation to contrive; otherwise the statement is not probative in dispelling these suggestions"). See also *Commonwealth* v. *Rivera*, 430 Mass. 91, 100 (1999) (statements made to police confessing involvement in murder admissible as prior consistent statements because witnesses had not been promised anything by Commonwealth in return for information); *Commonwealth* v. *Sullivan*, 410 Mass. 521, 527 (1991) (nineteen-page handwritten statement written nearly ten months before witness made agreement with Commonwealth for leniency with regard to pending indictments in exchange for testimony at trial properly admitted as prior consistent statement).

It was not only inevitable, but necessary for the defense to attempt to impeach Kelley at trial with a claim of recent contrivance. To utilize his alibi, Knight's defense relied on establishing the victim's date of death as Friday, June 21, not Wednesday, June 19. It was imperative for Knight to establish not only that Kelley was lying about the date of the murder, but also that she had a motive to implicate herself and Knight in a murder they did not commit, and that her motive was the plea agreement that got her out of jail. This strategy was apparent to the judge at least as early as defense counsel's opening statement, which was made immediately after the Commonwealth's.[13] In these circumstances, the judge's failure to exclude, sua sponte, Kelley's brief testimony about having made prior consistent statements was not error.

Knight's further claim that Kelley had a reason to fabricate a story about the robbery and murder before speaking to her father and her friend in September, 1996, is equally meritless. The gravamen of Knight's theory at trial was that Kelley fabricated the story about participating in a murder that she did not commit so that she could get out of jail as soon as possible. It would defy logic on the facts of this case to conclude that she had reason to formulate such a false story long before any indictment, arrest, or incarceration.

Finally, the fact that the judge did not give a limiting instruction when Kelley testified to these prior statements was not error. The judge properly and adequately instructed the jury on the limited use of prior statements both when Kelley's friend was called by the Commonwealth to testify about the substance of their conversation in September, 1996,[14] and in her charge to the jury. See *Commonwealth* v. *Rivera, supra* at 100 (no substantial likelihood of miscarriage of justice created by lack

---

[13]See *Commonwealth* v. *Rivera, supra* at 93, 100 (both prosecution and defense counsel in opening statements "indicated to the jury that the credibility of the witnesses testifying under agreements with the Commonwealth or the United States would be central to their case," and statements were properly admitted because "[d]efense counsel made plain in his opening statement that he would attack the credibility of the witnesses, and on cross-examination did impeach them with the various stories they told the police when first questioned").

[14]The judge instructed the jury: "You may use that testimony if you find it helpful in assessing or evaluating the credibility or believability of Betsy

of limiting instruction at time of testimony about prior consistent statement).

d. *Ineffective assistance of counsel.* "In capital cases, we review an ineffective assistance of counsel claim under the substantial likelihood of a miscarriage of justice standard, which is more favorable to the defendant." *Commonwealth* v. *Graham*, 431 Mass. 282, 289, cert. denied, 531 U.S. 1020 (2000). In reviewing each claim, "[w]e look to see whether there was an error in the course of the trial and, if there was, 'whether that error was likely to have influenced the jury's conclusion.' " *Id.*, quoting *Commonwealth* v. *Parker*, 420 Mass. 242, 246 & n.5 (1995). Knight claims that his counsel was ineffective because he failed to request an alibi instruction, failed to call a potential defense witness, failed to produce evidence which would have impeached a portion of Kelley's testimony, and failed to cross-examine adequately the medical examiner about the time of death.

We first consider whether defense counsel erred by not requesting an alibi instruction. Knight asserts that the lack of a specific alibi instruction was error because his alibi was a critical part of his defense. However, "it cannot be counted a mistake to omit the [alibi] charge, if it is otherwise made clear that the burden of showing that the defendant was present at the time and place, and thus capable of committing the crime, remains on the Commonwealth." *Commonwealth* v. *Medina*, 380 Mass. 565, 579 (1980), *S.C.*, 430 Mass. 800 (2000). "In considering the judge's instructions we look to the entire charge." *Commonwealth* v. *Sarmanian*, 426 Mass. 405, 408 (1998). There was no error because the instructions in their entirety properly informed the jury of the Commonwealth's burden of proving beyond a reasonable doubt that Knight committed the crimes charged, and that he was physically present at the scene of the crime. See *Commonwealth* v. *Sarmanian, supra*; *Commonwealth* v. *Medina, supra.*

We next consider whether defense counsel was ineffective in not calling Phyllis Danieli as a witness at trial. Danieli testified

Kelley. However, you may not consider anything that was just said about what Ms. Kelley told her for the truth of anything contained in that statement."

before the grand jury in December, 1996, that she had coffee with the victim the day before his body was found, that the victim asked Danieli to come to his apartment that night, gave her his telephone number, and said to telephone him that evening, at 7 P.M. She did not telephone the victim that night, nor did she go to his apartment. The next day, Danieli heard the victim had been murdered. She was "shocked" when she heard about the victim's death, and testified that she told people, "Wow. Thank God I didn't go in there that night. I could have been killed."

At trial, defense counsel called five witnesses who testified that they had seen the victim alive on Friday, June 21, 1996, and a sixth witness, the victim's uncle, who testified that he had coffee with the victim on Thursday, June 20, 1996. The Commonwealth attacked the witnesses' credibility on cross-examination by establishing that each of the them saw the victim often, in some cases, every day, and there was "nothing to distinguish one day from the next." Knight asserts that the failure to call Danieli as a seventh witness was ineffective because she had a specific memory of having seen the victim "the day before he was killed"; and the Commonwealth could not have impeached her by claiming that she saw the victim often, and therefore was confused about the date.[15]

Defense counsel's decision not to call Danieli was a tactical one, which did not constitute ineffective assistance of counsel. Danieli's testimony that she saw the victim alive after Wednesday, June 19, 1996, was cumulative of the testimony of six other defense witnesses. See *Commonwealth* v. *Britto*, 433 Mass. 596, 602-603 (2001) (decision not to call additional witnesses relative to issue of identification not error because testimony cumulative); *Commonwealth* v. *Sarmanian, supra* at 406-407 (failure to call additional witness to bolster defendant's claim not error because additional evidence would have been

---

[15]On appeal, Knight submitted affidavits from his wife and sister. Each claimed to have spoken with Danieli, who in turn stated she saw the victim the day before his body was found, and expressed her willingness to testify at trial. Knight did not submit an affidavit from trial counsel as to his reasons for not calling Danieli.

cumulative, not dispositive). Moreover, Danieli's credibility was subject to serious challenge. She testified before the grand jury that she had been arrested and had a history of drug use, that she had bought and used drugs immediately after having coffee with the victim, and that she could not remember the date on which she last saw the victim other than "it was in June." In addition, Danieli did not tell her story to the police until "they picked me up last Sunday [December 8, 1996]," almost six months after the murder. The decision not to call Danieli as a witness was not error.

We next consider whether defense counsel was ineffective based on his alleged failure to introduce evidence that would purportedly have impeached a portion of Kelley's testimony. The decision whether and how to "impeach a witness remains a tactical one in which a great amount of discretion is vested in the attorney." *Commonwealth* v. *Britto, supra* at 603. There is no question that defense counsel exhaustively cross-examined and attempted to impeach Kelley's testimony in many ways and in many respects. Knight contends, however, that his counsel's failure to produce additional impeaching evidence was error.

Kelley testified on direct examination that while Knight was in the bedroom murdering the victim, she was in the kitchen "looking for pills and stuff and money." Although she testified that she "didn't really want to touch anything" because she did not want to leave fingerprints, she also testified that she picked up the cordless telephone from the wall and "dialed the weather." After listening for a minute or so, Kelley put the telephone down "[u]nder a bunch of clothes and stuff." When Kelley was asked whether she shut the telephone off, she testified, "I think I — I don't think I shut it off." The victim's landlord testified that he had tried to telephone the victim on Saturday afternoon, June 22, but that the line was busy.

Knight contends that this telephone testimony could have and should have been impeached more thoroughly. In support of this contention, his appellate counsel had an experiment conducted that purportedly demonstrates that when a cordless telephone is not disconnected, a person calling that telephone

will receive a "busy" signal until the battery runs out, at which time the person will hear a "ringing" signal.[16] Knight asserts that this proves that Kelley lied about using the cordless telephone in the victim's apartment, because, he states, if Kelley had not shut off the phone on Wednesday night, the battery would have lost power by Saturday and the landlord would have received a "ringing" signal, not a "busy" signal when he telephoned that day. Trial counsel's failure to conduct a similar experiment to use as evidence to impeach Kelley's testimony, Knight argues, was ineffective. We disagree.

"Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference." *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). "Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." *Id.* In addition, we have "never held that a lawyer must pursue every possible avenue in order to forestall an ineffective assistance claim." *Commonwealth* v. *Britto, supra* at 604. We do not know whether trial counsel conducted a similar experiment and made a strategic decision not to use the results at trial.[17] We do know, however, that the information contained in the affidavit attached to Knight's motion for a new trial is less than compelling, and does not provide a basis on which to conclude that it would have changed the outcome of the trial. The probative value of this experiment is at best questionable. The telephone used in the experiment was not the actual telephone that was found in the victim's apartment, nor is it clear whether the telephone used in the experiment was even the same type or was similar in any respect to the telephone in the victim's apartment. Moreover, Kelley's

---

[16]This experiment is described in an affidavit that is attached as an exhibit to Knight's motion for a new trial. In addition to this affidavit, he submitted pages from users' manuals for two cordless telephones; one states "[a] fully charged battery provides an average talk time of up to five hours," the other that "[t]he maximum battery life between charges is [seven] hours of continuous talk time . . . ."

[17]As noted, no affidavit from trial counsel was filed.

testimony about whether she shut the telephone off was equivocal. In these circumstances, the failure to attempt to impeach Kelley's testimony with the results of a similar experiment was not ineffective.

Finally, we consider Knight's claim that defense counsel failed to present sufficient evidence to support the defense theory that the victim died on Friday, June 21, 1996, rather than on Wednesday, June 19, 1996. On appeal, Knight offers a portion of a police report, in which the emergency medical technician (EMT) who declared the victim deceased on Saturday, June 22, at approximately 3 P.M., stated the victim's body "was very rigid." Rigidity is consistent with rigor mortis, which occurs shortly after death and continues for approximately one day. Knight also submits a pretrial memorandum from defense counsel to the trial file, memorializing a conversation with the medical examiner during which the medical examiner "[d]isputes [the] EMT on rigor" and states "[t]ime of death from early P.M. Friday consistent given heat of apartment." He contends that defense counsel did not effectively use this information in cross-examining the medical examiner.[18]

Knight neglects to mention the very effective cross-examination of the medical examiner that his counsel did conduct. During that cross-examination, defense counsel established that the medical examiner could not pinpoint the exact time of death and that it could have occurred at any time within hours before the body was discovered. He also established that different bodies decompose at different rates; that the victim's apartment was fairly warm which would have accelerated the rate of decomposition; and that two of the victim's medical conditions, heart disease and diabetes, also could have accelerated the rate of decomposition. The fact that the examination of any witness may not have been perfect is not the standard we use to evaluate the effectiveness of counsel. See *Commonwealth* v. *Fisher, supra* at 357. Counsel was not ineffective.

e. *G. L. c. 278, § 33E.* We have considered the entire record pursuant to G. L. c. 278, § 33E, and we see no reason to

---

[18]Knight does not claim that defense counsel should have called the emergency medical technician as a witness at trial.

exercise our authority to reduce the jury's verdict or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*