# United States Court of Appeals
## For the First Circuit

No. 05-1770

EDWARD KNIGHT,

Appellant,

v.

LUIS SPENCER,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,[*] Senior U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
Lipez, Circuit Judge.

Edward B. Gaffney for appellant.
Daniel I. Smulow, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, Office of the Attorney
General, was on brief for appellee.

May 2, 2006

---

[*]Of the Southern District of New York, sitting by designation.

**CAMPBELL**, <u>Senior Circuit Judge</u>.  Edward Knight appeals from the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1) in the United States District Court for the District of Massachusetts.  Knight argues that the Massachusetts Supreme Judicial Court ("SJC") erred in holding, first, that Knight's Sixth Amendment right to confrontation was not violated when the state trial court refused to allow him to pursue a particular area of inquiry during cross-examination of a prosecution witness, and, second, that Knight's counsel was not constitutionally ineffective.

## I.  Background

On December 31, 1996, Knight was indicted in Massachusetts by the Suffolk County Grand Jury for the murder and armed robbery of Pasquale Candelino.  A jury trial was held in Suffolk Superior Court, and on June 29, 1998, Knight was found guilty of armed robbery and first degree murder.  He received a life sentence on the murder conviction, and the armed robbery conviction was placed on file.  On June 30, 1998, Knight appealed.

On July 25, 2000, Knight filed and later supplemented a motion for a new trial.  On May 22, 2001, the Superior Court denied the motion.  On May 30, 2001, Knight appealed from the denial of his motion for a new trial, and that appeal was consolidated with the direct appeal from his conviction.  Both appeals were rejected by the SJC.  <u>Commonwealth</u> v. <u>Knight</u>, 773 N.E.2d 390 (Mass. 2002).

On July 2, 2003, Knight petitioned the federal district court for a writ of habeas corpus. After a hearing and following issuance of a comprehensive memorandum, the district court denied the petition. Knight thereupon filed a notice of appeal and an application for a Certificate of Appealability. The district court granted a Certificate of Appealability for the petitioner's Confrontation Clause and ineffective assistance of counsel claims.

## II.  Supreme Judicial Court Decision

A state court's factual findings are presumed to be correct under 28 U.S.C. § 2254(e)(1). See Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002); Coombs v. State of Maine, 202 F.3d 14, 18 (1st Cir. 2000). The SJC found the following facts in Knight's case:

> Pasquale Candelino was a sixty-one year old man who resided in the North End section of Boston. In the afternoon of Saturday, June 22, 1996, his body was found by his landlord in the bedroom of his apartment. The apartment had been "ransacked, drawers were open, doors, cabinet doors were open," and there was blood on the floor and the walls of the bedroom and bloody fingerprints inside an open drawer. [FN2. These were not identifiable.]
>
> The medical examiner conducted an autopsy and determined that the victim died of multiple stab wounds to the neck. [FN3. The victim had been stabbed ten times in the neck.] The state of the body's decomposition was consistent with the injuries having been inflicted, and death having occurred, as early as the previous Wednesday, June 19, 1996. [FN4. The body "was in an early state of decomposition with green/black discoloration of the right side of the head and chest," and "marbling of the skin and skin slippage and wrinkling of the forearms."]

Knight and his girlfriend, Betsy Kelley, were drug addicts who supported their habits principally by shoplifting. They had sold stolen goods to the victim in the past, and had also purchased pills from him. On Wednesday evening, June 19, 1996, sometime after 9 P.M., they were in the North End looking for money to buy drugs. Their normal hunting grounds, the malls, were closed. They saw the victim on the street, and Knight suggested they rob him. Kelley agreed. She approached the victim and asked if she could use the bathroom in his apartment. While Kelley was in the victim's apartment (and the victim was in his bedroom), Knight rang the door bell and Kelley let him in.

Knight hid behind the refrigerator in the kitchen. When the victim came out of his bedroom Knight attacked him, pushing him back into the bedroom where a struggle ensued. Kelley remained in the kitchen searching for drugs and money. Kelley heard the victim saying, "Eddie what - what are you doing? What are you doing?," and "Eddie, no." She also heard Knight tell the victim to "shut the fuck up." After the struggle ended, "It was just quiet," and Kelley heard "drawers opening." When Knight came out of the bedroom, he had blood on his sneakers. Kelley and Knight put drugs and "stuff" from the victim's apartment in a black bag, then wiped the door knobs with their shirts as they were leaving. They went to a friend's apartment, where Knight told Kelley he had killed the victim.

Late in the evening of the next day, Thursday, June 20, 1996, Knight, Kelley, and two friends left for Florida on a bus that arrived in Orlando on Saturday morning, June 22, 1996. Knight and Kelley returned separately to the Boston area the following week. After their return, they went to the Boston Public Library and looked for newspaper accounts of the murder. The articles they found reported that the police believed the murder to have occurred on Saturday, June 22, 1996, the day on which Knight and Kelley arrived in Florida. Knight told Kelley not to worry, because "they have the dates wrong."

In September 1996, three detectives came looking for Kelley at her father's home where she was staying. Her father was not at home, and she did not answer the door. After the detectives left, Kelley telephoned her father and told him that she was in trouble and had been present

-4-

when Knight had killed someone. Her father began arranging for a lawyer to represent her. Kelley's father drove her to a friend's house, and she told the friend what had happened in the victim's apartment on the night of the murder.

Knight was arrested on December 16, 1996, and was indicted on December 31, 1996, for murder in the first degree and armed robbery. The indictment stated that the victim died "on or about June 21, 1996." Kelley was also indicted and, as arranged by her lawyer, surrendered to the police on January 2, 1997. After being held in jail pending trial for more than one year, Kelley agreed to be interviewed by detectives and, in January 1998, negotiated a plea agreement with the Commonwealth. The agreement required that she testify at Knight's trial and plead guilty to manslaughter. The Commonwealth agreed to recommend an eighteen-month sentence, guaranteeing Kelley's release from prison shortly after Knight's trial.

When Kelley was interviewed, she told the detectives that the victim had been robbed and killed on June 19, 1996, before she and Knight went to Florida. Thereafter, the Commonwealth moved to amend the indictment to change the date of the murder to "on or about June 19, 1996." After a hearing, the motion judge allowed the amendment over Knight's objection.

At trial, the Commonwealth relied primarily on Kelley's testimony to establish Knight's guilt. The Commonwealth also introduced evidence of a knife that police seized from Knight when he was arrested on unrelated charges on June 27, 1996, five days after the victim's body was found. The medical examiner's testimony indicated that the knife was not inconsistent with the victim's wounds. The defense relied primarily on the testimony of six witnesses from the victim's neighborhood who testified that they had seen the victim at various locations on Thursday, June 20, and Friday, June 21, when the undisputed evidence demonstrated that Kelley and Knight were on a bus bound for Florida. [FN5. The Commonwealth contended that these witnesses saw the victim often, and were simply mistaken with regard to when they last saw him.] The defense contended that Kelley's testimony was a fabrication induced by the Commonwealth's offer of an eighteen-month sentence and by her fear of remaining in prison for life if she were

-5-

convicted.  The Commonwealth attempted to rebut this contention by calling the friend to whom Kelley had confided the details of the murder in September, 1996, long before her indictment, arrest, and incarceration.

Knight, 773 N.E.2d at 394-95.

In its opinion, the SJC considered Knight's claims of trial error, including those now included in Knight's habeas petition.

Among the latter was Knight's challenge to the ruling by the trial judge that defense counsel could not, when cross-examining Betsey Kelley, inquire about the effect upon her of the guilty verdict in the contemporaneous state trial of Louise Woodward, a nineteen-year-old British au pair, found guilty of second-degree murder in the death of an infant in her care.  The judge in Woodward's case had subsequently reduced the jury's verdict to involuntary manslaughter, vacated her life sentence, and sentenced her to time served.  Knight, 773 N.E.2d at 398, n.9.  The SJC held that the trial judge's ruling excluding reference to Woodward's case had not violated Knight's constitutional right to confrontation under the Sixth Amendment to the United States Constitution and Article 12 of the Declaration of Rights of the Massachusetts Constitution.  Id.  The SJC said, inter alia,

[t]he judge did not improperly limit the defense's cross-examination of Kelley . . . because the jury were presented with sufficient evidence with which to assess her bias and credibility.  She was extensively cross-examined about her drug use, prior convictions of forgery, larceny, and fraud, her plea agreement with the Commonwealth, and her fears about being convicted of

murder and incarcerated for life.  In this context, we conclude that the judge's ruling excluding the minimally relevant but highly inflammatory line of questions about the Woodward verdict was not error.

Id. at 399.

The SJC also reviewed certain of Knight's claims of ineffective assistance of counsel, applying the "substantial likelihood of a miscarriage of justice" standard applicable in appeals of first degree murder convictions in Massachusetts.  See Mass. Gen. Laws ch. 278, § 33E.  This statutory standard is more favorable to the defendant than the federal constitutional standard articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), or the Massachusetts constitutional standard outlined in Commonweath v. Saferian, 315 N.E.2d 878 (Mass. 1974).  See Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992).  See also Mello v. DiPaulo, 295 F.3d 137, 144 (1st Cir. 2002).  The SJC held that Knight's counsel was not ineffective but rather had made a tactical decision in choosing not to call a seventh alibi witness; that his failure to attempt to impeach Kelley on her testimony regarding her use of the phone in the victim's apartment was not ineffective; and that defense counsel was not ineffective in putting forward the defense theory that the victim had died on Friday, June 21 rather than on Wednesday, June 19.

### III.  District Court's Conclusions

In its April 21, 2005 unpublished memorandum and order, the district court made the following conclusions about the issues

-7-

in Knight's habeas petition. Regarding the Confrontation Clause violation alleged to have resulted from denying cross-examination about the case of Louise Woodward, the court held:

> the SJC's decision on the Confrontation Clause was not contrary to or an unreasonable application of the principles articulated in Van Arsdall [Delaware v. Van Arsdall, 475 U.S. 675 (1986)]. The Woodward line of questioning did not involve a "prototypical form of bias" like a plea agreement or a sentence reduction, but rather was aimed at demonstrating that a verdict against another teenager in an unrelated case caused Kelley to confess to a crime of which she was innocent. Moreover, the topic of the Woodward verdict was not necessarily "otherwise appropriate cross-examination," given its highly prejudicial nature and the weak showing of relevance made by the defense.

On the ineffective assistance of counsel claim, the district court concluded that Knight's counsel had not been ineffective, holding, among other rulings, that "Knight has not shown that the decision not to call Danieli [an alibi witness] rendered his counsel non-functional or deprived him of a fair trial." Regarding the decision not to cross-examine Kelley regarding her testimony about using the telephone in the victim's apartment, the district court concluded that "it was not contrary to or an unreasonable application of federal law for the SJC to conclude that defense counsel was not deficient in declining to question Kelley about her use of the telephone." Defense counsel's failure to object to Kelley's prior consistent statements was not "'so patently unreasonable that no competent attorney' would have taken this approach." Finally, the trial strategy not to emphasize the

victim's time of death in the closing was "within the bounds of reasonableness."

## IV.  Discussion

### A.  Standard of Review

"In reviewing a judgment on a petition for a writ of habeas corpus, this Court examines the legal conclusions of the district court, including the proper standard of review, de novo." Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003).  "The Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') prevents a federal court from granting an application for writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id.  The "contrary to" category "embraces cases in which a state court decision directly contravenes Supreme Court precedent." Mastracchio v. Vose, 274 F.3d 590, 597 (1st Cir. 2001) (citation omitted).  The "unreasonable application category" includes cases in which the state court's decisions, while not "contrary to" relevant Supreme Court precedent, nonetheless constitute an "unreasonable application" of that precedent. Id.

The Supreme Court has said that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the

-9-

[Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially undistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" analysis, however, affords relief only if "the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." Id. at 413.

A state court need not cite or be aware of Supreme Court precedents so long as "neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). As noted above, determinations of fact issues shall be presumed correct, and the petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## B. Confrontation Clause

Knight argues in his petition for habeas corpus that it was a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution for the state trial judge to have denied him the opportunity on cross-examination to inquire of Betsy Kelley, the chief prosecution witness, whether the guilty verdict returned by the jury in a much publicized but unrelated Massachusetts criminal case, Commonwealth v. Woodward, may have led her into supporting the government's position. See Knight, 773

-10-

N.E.2d at 398, n.9; Commonwealth v. Woodward, 694 N.E.2d 1277 (Mass. 1998).  The defense wished to argue that the subsequently reduced murder verdict in Woodward -- leaving some to believe the British nanny was wrongly convicted of murdering the infant in her care -- persuaded Kelley that it was safer for her, even if Knight and she were innocent, to lie in the prosecution's favor, i.e., to testify untruthfully that Knight had killed the victim on Wednesday, June 19, while Kelley was present in the apartment, rather than to join in Knight's alibi, supported by witnesses, that the victim was seen still alive on Thursday and on Friday afternoon, by which times Knight and Kelley had taken a bus to Florida.  Knight's attorney hoped the jury would analogize Kelley to Woodward, both of them being nineteen years old and unfamiliar with the legal system.  He would argue that, upon hearing of Woodward's allegedly unjust conviction, Kelley abandoned hope of prevailing on a truthful defense and opted to go along with the prosecution in exchange for a highly favorable plea bargain that ensured her own release soon after Knight's trial.[1]

The trial judge, however, refused to allow defense counsel to refer to the Woodward case, ruling it was "very controversial," "emotionally loaded," and insufficiently relevant. (In upholding the ruling, the SJC characterized the proposed line

_____

[1]Defense counsel told the court he learned of Kelley's possible concern stemming from the Woodward verdict from Kelley's attorney.

-11-

of questioning as "minimally relevant but highly inflammatory," Knight, 773 N.E.2d at 399.) The trial court ruled that defense counsel could, however, inquire at length "as to [Kelley's] concerns and fears about conviction, about incarceration, and anything of that sort."

The Supreme Court has recognized that "the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Delaware v. Van Arsdall, 475 U.S. 674, 678-79 (1986) (citation omitted). But the Court also noted that

> [i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

Id. at 679.

In Van Arsdall, the Supreme Court held that a state court offends the Confrontation Clause when it prevents the defense from engaging in:

> otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

-12-

475 U.S. at 680 (quoting <u>Davis</u> v. <u>Alaska</u>, 415 U.S. 308, 318 (1974)). Regarding this approach, the First Circuit has stated:

> The first question to be asked under the <u>Van Arsdall</u> test is whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? . . . The second element of the <u>Van Arsdall</u> test is whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted.

<u>DiBenedetto</u> v. <u>Hall</u>, 272 F.3d 1, 10 (1st Cir. 2001) (citations omitted). Knight argues that the SJC and the federal district court erred in upholding the trial court's ruling because Knight was precluded from pursuing an entire line of questioning related to Kelley's views on the <u>Woodward</u> verdict and as a result was prevented from addressing the crucial question of why she would testify against the petitioner if she and he were both innocent of any wrongdoing. Knight further observes that the prosecution took unfair advantage of the fact that the defense had not explained Kelley's reason for testifying against Knight when it argued at closing that Kelley's testimony was incredible because an innocent person with a good alibi would not falsely claim to have been involved in a murder.

The district court was plainly correct that the possible effect on Kelley of the <u>Woodward</u> verdict could not be said to involve a "prototypical form of bias,"[2] the expression used by the

---

[2]The <u>Random House Dictionary of the English Language</u> (2nd ed. 1987) defines prototypical as the adjectival form of "prototype:"

-13-

Court in Van Arsdall. As the district court found, Knight sought merely to persuade the jury "that a verdict against another teenager in an unrelated case caused Kelley to confess to a crime of which she was innocent." In the present circumstances, this was scarcely a "prototypical form of bias," such as a plea agreement or sentence reduction, as in Van Arsdall, where the defense counsel was wrongly prevented from asking a witness about his agreement to cooperate with the prosecution in exchange for dismissal of a drunk driving charge. 475 U.S. at 676.

The claimed relevance of Woodward was that its publicized jury verdict of second degree murder may have so enhanced Kelley's fear that she would be convicted of murder and sent away for life that, notwithstanding her actual innocence, she lied in order to secure the favorable plea bargain that promised her almost immediate release. We are not persuaded, however, that the introduction of Woodward into the case would have given the jury a significantly different impression of Kelley's credibility. DiBenedetto, 272 F.3d at 10. Without Woodward, Knight's counsel was still able to point out the extremely attractive nature of the plea agreement to one in Kelley's shoes, with its assurance of nearly instant release, coupled with Kelley's natural worry that if she depended upon Knight's alibi defense she might still be

---

"the original or model on which something is based or formed" or "someone or something that serves to illustrate the typical qualities of a class, model; exemplar."

convicted of murder -- all matters on which cross-examination was expressly allowed. Thus, wholly apart from any impact of Woodward, the basic components of Knight's challenge to Kelley's credibility were available. And while Woodward was initially convicted of second-degree murder, that verdict was almost immediately vacated, and Woodward herself released, making it less plausible that that case alone would have explained why an innocent Kelley would have invented the story she told. To be sure, reference to Woodward might have offered the defense some added color, but it also raised the danger of being used as a red herring. The trial judge found the Woodward case to be "very controversial" and "emotionally loaded in many different ways," hence, in effect, a potential detour to confusion of the issues. Van Arsdall, 475 U.S. at 679 (trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, "confusion of the issues . . . or interrogation that is . . . only marginally relevant."). Given the tenuous materiality of the Woodward case and its potential for jury confusion, we think the trial judge's ruling was constitutionally within his discretion.

Knight compares his situation to that in Davis, but the analogy is unpersuasive. In Davis, the Supreme Court ruled that a state court had erred when it refused to admit evidence of potential bias of a prosecution witness in the form of the fact that the witness was on probation. 415 U.S. at 318. Here,

-15-

however, Knight was permitted to introduce evidence of Kelley's prior drug dealing and of her plea agreement. The information about her alleged reaction to the <u>Woodward</u> verdict was not relevant in the same way, if at all. The <u>Woodward</u> verdict had no role in the case and had nothing to do with Kelley's past history as a drug dealer and user.

We think Knight has not demonstrated that the trial court's ruling constituted an unreasonable application of Supreme Court law and so violated the Sixth Amendment.

## C. Ineffective Assistance of Counsel

Knight also argues that the SJC unreasonably applied clearly established federal law by failing to accept his claim that he received ineffective assistance of counsel at trial. Specifically, he complains about four alleged errors made by his attorney: (1) counsel's decision not to object to the introduction of prior consistent statements made by Kelley; (2) counsel's decision not to call a seventh alibi witness, Phyllis Danieli; (3) counsel's failure to cross-examine Kelley about using the victim's telephone; and (4) counsel's argument to the jury concerning the time of the victim's death.

"A criminal defendant claiming a Sixth Amendment ineffective assistance of counsel violation must establish that (1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'a reasonable probability that, but for

-16-

counsel's unprofessional errors, the result of the proceeding would have been different.'" Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir. 2005) (quoting Strickland, 466 U.S. at 684). Under the first prong of Strickland, there is a "strong presumption" that counsel's strategy and tactics fall "within the range of reasonable professional assistance," and courts should avoid second-guessing counsel's performance with the use of hindsight. Strickland, 466 U.S. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . ., and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. It is only where, given the facts known at the time, counsel's "choice was so patently unreasonable that no competent attorney would have made it," that the ineffective assistance prong is satisfied. Under the prejudice prong, not all errors by counsel are sufficient to meet the standard of a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different. Id. at 693-94. Rather, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Smiley, 422 F.3d at 20 (quoting Strickland, 466 U.S. at 694). This is a "highly demanding" and "heavy burden." Williams, 529 U.S. at 393. A defendant's failure to satisfy one prong of the Strickland analysis obviates the need

for a court to consider the remaining prong. <u>Strickland</u>, 466 U.S. at 697.

This Circuit has held that where the SJC applies its more favorable "substantial likelihood of a miscarriage of justice" standard, its decision will not be deemed to be "contrary to" the <u>Strickland</u> criterion:

> [T]he SJC rejected [the petitioner's] ineffective assistance of counsel claims under a "substantial likelihood of a miscarriage of justice" standard that the SJC says is more favorable to a defendant than the <u>Saferian</u> standard, which we have said is the functional equivalent of the <u>Strickland</u> standard. We therefore conclude that the SJC applied a standard of ineffective assistance of counsel that is at least as favorable to [the petitioner] as the federal standard.

<u>Mello</u> v. <u>DiPaulo</u>, 295 F.3d 137, 144 (1st Cir. 2002).

To warrant habeas relief under the unreasonable application standard, Knight must show that the counsel's work fell below an objective standard of reasonableness <u>and</u> that but for the ineffective assistance, the outcome of the case would have been different. Knight has not made a showing regarding the first prong with respect to any of his four ineffective assistance claims, so we do not reach the second prong of the analysis.

### i. Failure to Object to Prior Consistent Statements

Knight argues that his counsel should have objected to the admission of testimony by Kelley stating that she had told her father and another person, two months after the victim's death, that she had been present when Knight had killed someone. Knight

-18-

argues that these were prior consistent statements that were inadmissible, but the SJC found that Knight was going to try to impeach Kelley and that her statements were, therefore, admissible to defend against the argument of recent contrivance. Knight, 773 N.E.2d at 399-400 (quoting Commonwealth v. Saarela, 383 N.E.2d 501 (Mass. 1978)). To the extent that Knight argues on appeal that the SJC erred in affirming the admission of the statements, that claim does not warrant federal habeas review because the SJC, which has the final word on questions of Massachusetts state law, affirmed their admission on the basis of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Knight's counsel could not have rendered ineffective assistance in failing to object to alleged errors of state evidentiary law that were either non-prejudicial or nonexistent. Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) ("failing to pursue a futile tactic does not amount to constitutional ineffectiveness"), cert. denied, 528 U.S. 1163 (2000). Therefore, Knight's counsel was not ineffective when he failed to object to the admission of the prior consistent statements.

### ii. Failure to Introduce Testimony of Phyllis Danieli

Knight argues that his counsel acted ineffectively by failing to call Phyllis Danieli as a witness to testify that she had seen the victim alive the day before his body was discovered -- while Knight was on a bus to Florida. Danieli had a distinct

-19-

memory of seeing the victim alive because he invited her to stop by his apartment that evening, and the next day, when she learned of his death, she realized that if she had accepted his invitation, she too might have been murdered.  However, Danieli, herself a drug user, was unable to recall the exact date she had seen the victim.

The SJC ruled that Knight's trial counsel's decision was strategic because Danieli's testimony was both cumulative of six other witnesses who said they had seen the victim before his body was discovered and also subject to severe impeachment because she had been arrested previously, had bought and used drugs immediately after having coffee with the victim, and could not remember the date when she last saw the victim other than it was June.  Knight, 773 N.E.2d at 402.  Knight argues that while the other witnesses were subject to attacks on cross-examination because they had seen the victim daily for years and could not distinguish one day from the next, Danieli had not seen the victim for many years and had particular reason to remember the occasion because she realized she might have been present at what became the murder scene.  Knight dismisses her potential credibility problems on the grounds that "her failure to remember the precise date (six months after the fact) was immaterial" and that the credibility of drug users was an issue throughout the case since the government's primary witness, Kelley, was herself a drug user.

As noted, however, counsel's performance is strongly presumed to fall within the range of reasonable professional judgment. Counsel was able to see and assess the likely demeanor and appearance of potential witnesses. Since Knight had called six alibi witnesses, and since Danieli was open to significant impeachment, it was appropriate for the SJC, and then the district court, to conclude that the trial counsel's decision was a tactical one rather than the result of ineffective assistance. The SJC's decision was an "appropriate application of Strickland's insistence on the 'wide latitude counsel must have in making tactical decisions.'" Horton v. Allen, 370 F.3d 75, 86-87 (1st Cir. 2004), cert. denied, 543 U.S. 1093 (2005) (SJC reasonably applied Strickland when it determined that counsel was not ineffective for failing to call several witnesses; upholding denial of habeas petition).

### iii. Failure to Impeach Kelley with "Telephone Testimony"

Knight argues that his counsel was ineffective for failing to impeach Kelley's inconsistent testimony regarding the victim's telephone. Kelley testified that, despite having been careful to leave no fingerprints in the apartment, she did pick up the telephone, dial an automatic weather service, and then hide the phone under some clothes without turning it off. These statements might have been designed to explain why the victim's phone was "off

-21-

the hook" when the landlord tried to reach him, and this explanation was cited by the government as evidence of Kelley's credibility. Knight now argues that his lawyer failed to introduce evidence that if Kelley had turned the phone on on Wednesday evening, the phone battery would have long since expired by Saturday afternoon, and the landlord's incoming calls would have been met by a ring, not by a busy signal. The SJC found that Kelley was not sure whether she had turned off the telephone; that, assuming she had left the telephone on, there was no probative evidence that the phone's battery would have been dead by Saturday afternoon; and that there was no evidence that the victim's phone would generate a ring instead of a busy signal when the telephone battery died. Knight, 773 N.E.2d at 402-04. In the absence of clearer evidence on this issue, it was not an unreasonable strategic decision by Knight's counsel not to seek to impeach Kelley about the telephone. If she was unsure about whether she had actually turned off the phone, there would be little point to try to prove the battery would have been dead. Additionally, Knight's appellate counsel conducted an experiment to try to prove that the battery would have been dead, but "[t]he telephone used in the experiment was not the actual phone that was found in the victim's apartment, nor [wa]s it clear whether the telephone used in the experiment was even the same type or was similar in any respect to the telephone in the victim's apartment." Knight, 773

N.E.2d at 402-03. Defense counsel at trial also notably did examine Kelley on a number of issues, including her drug use, prior convictions, and her plea agreement. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8 (2003). Thus, Knight's ineffective assistance claim fails on this point.

### iv. Failure to Argue Effectively the Physical Evidence Relative to the Time of Death

Knight argues that his trial counsel failed to make sufficiently detailed and convincing arguments in support of the point that the state of the victim's body was consistent with death's having occurred on Friday night rather than earlier on Wednesday night. Counsel notes various aspects of the medical examiner's testimony which, had they been called to the jury's attention during closing argument, would or might have created a stronger case for the proposition that death had not occurred until the time consistent with the defense's alibi evidence.

The right to effective assistance extends to closing arguments, but counsel is allowed wide latitude with regard to "which issues to sharpen and how best to clarify them." Yarborough, 540 U.S. at 5. The Supreme Court has made it clear that:

> counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical

-23-

> decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers.

Id. (internal quotations and citations omitted). Courts are thus hesitant to find that an attorney's decision to leave out reference to particular aspects of the case in closing argument constitutes ineffective assistance. Id. The closing must also be viewed in the context of the entire proceeding. See, e.g., Bell v. Cone, 535 U.S. 685, 699-702 (2002) (analyzing attorney's decision not to make a summation in relation to nature and timing of the expert witnesses' testimony). In the instant case, the SJC found "very effective" the cross-examination of the medical examiner by Knight's counsel, Knight, 773 N.E.2d at 403-04, and the district court wrote that, "[g]iven this admonition [in Yarborough], and the defense counsel's detailed cross-examination of the medical examiner as to the victim's time of death, the SJC properly applied the Strickland presumption that the trial strategy was within the bounds of reasonableness." Given the wide latitude of discretion available to defense counsel to conduct the defense in the manner of his or her own choosing, counsel's summation of the time of

-24-

death evidence cannot be said to have established ineffective assistance within <u>Strickland</u>.[3]

### v. Cumulative Error

Knight finally argues that the cumulative effect of his trial attorney's purported errors resulted in his receiving constitutionally deficient representation.  As the government observes, he did not make this argument in state court, before the district court, or in his motion for a certificate of appealability.  The issue is therefore not exhausted pursuant to 28 U.S.C. § 2254(b)(1)(A) and is not properly before this Court. <u>Feliciano</u> v. <u>Rullan</u>, 378 F.3d 42, 49 (1st Cir. 2004), <u>cert.</u> <u>denied</u>, 534 U.S. 1054 (2005) ("It is a bedrock rule that when a party has not presented an argument to the district court, [he] may not unveil it in the court of appeals") (internal quotations omitted, alteration in original).

We add, without deciding, that even were the argument of cumulative effect properly before us, it would be an uphill battle for appellant.  <u>See</u> <u>United States</u> v. <u>Franklin</u>, 321 F.3d 1231, 1241 n.4 (9th Cir. 2003) (no individual errors, hence no cumulative error).

### Affirmed.

---

[3]We note that our review of this issue is further limited by the absence of the relevant state court transcripts. <u>Cruz-Sanchez</u> v. <u>Rivera-Cordero</u>, 835 F.2d 947, 949 (1st Cir. 1987) ("Appellant has the responsibility of including in the appellate record all trial materials upon which he intended to rely.")