**David LEJA, Petitioner**

v.

**UNITED STATES of America, et al, Respondents.**

**Civil Action No. 06–30169–MAP.**

United States District Court, D. Massachusetts.

May 16, 2007.

David Leja, Ayer, MA, pro se.

Lenore Glaser, Law Office of Lenore Glaser, Boston, MA, for Petitioner.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Respondents.

### *MEMORANDUM AND ORDER REGARDING MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE,* (Dkt No. 1 as amended)

PONSOR, District Judge.

### I. *INTRODUCTION AND PROCEDURAL HISTORY*

On December 14, 2004, following a jury-waived trial, Petitioner was convicted on numerous counts of health care fraud, mail fraud, and obstruction of justice. Prior to announcing its verdict, the court noted that "the evidence against the defendant [was], quite simply, overwhelming," making the conviction inevitable despite defense counsel's "vigorous and highly competent" representation. (Hrg. Tr. 6, Dec. 14, 2004.) On May 23, 2006, the First Circuit affirmed Petitioner's conviction. *United States v. Leja,* 448 F.3d 86 (1st Cir.2006).

On October 2, 2006 Petitioner, represented by counsel, filed his original petition for *habeas* relief pursuant to 28 U.S.C. § 2255. (Dkt. No. 1.) The court subsequently granted Petitioner's motion for expedited hearing on Sections A and B of this petition, which sought an immediate order requiring Respondent to release him from custody to home confinement. Following a hearing, the court on November 29, 2006, allowed Respondent's motion to dismiss these two claims, holding that "no legal authority exists giving the court the power to order Respondents to release Petitioner to home confinement." (Dkt. No. 13, at 3.)

The court at that time also gave Petitioner leave to amend his original petition. Counsel subsequently withdrew, and Petitioner took over responsibility for his own representation *pro se.*

On December 22, 2006, Petitioner filed a motion for reconsideration of this court's order allowing Respondent's motion to dismiss the two portions of his original Petition regarding placement in home confinement. This motion was denied that same day.

Also on December 22, Petitioner filed a motion to amend his original petition, seeking to add several new claims of ineffective assistance of counsel. (Dkt. No. 20.) Five days later, on December 27, Petitioner filed a second motion for recon-

sideration of the court's allowance of Respondent's motion to dismiss. (Dkt. No. 21.) On January 22, 2007, Petitioner filed a motion to compel Respondent to give him a "medical furlough." (Dkt. No. 23.)

Respondent did not oppose Petitioner's motion to amend (Dkt. No. 20); the court has allowed that motion by marginal notation and will consider the additional claims offered via that amendment in the discussion below. Respondent did oppose the second motion for reconsideration as well as the motion for the furlough, and both of these motions have been denied, also by marginal notation, based on the lack of any legal or factual basis.

On February 12, 2007, Respondent filed her opposition to Petitioner's motion to vacate, as originally filed and amended, and requested dismissal of the petition. (Dkt. No. 34.) On February 21, Petitioner filed his reply. (Dkt. No. 37.) For the reasons set forth below, the Petition will be denied and the Respondent's request for dismissal will be allowed.

## II. *DISCUSSION*

### A. *Sentencing.*

Petitioner contends that he was denied the right to know the basis for his sentence in violation of his Fifth Amendment right to due process. The heart of his argument is that the court arbitrarily calculated the amount of the intended loss encompassed by his fraudulent scheme for purposes of determining the applicable advisory sentencing guideline range.

Petitioner is correct that gross factual errors can sometimes so infect the sentencing process as to "render[ ] the entire sentencing procedure invalid as a violation of due process." *United States v. Stein,* 544 F.2d 96, 102 (2d Cir.1976); *see also United States v. Dewire,* 271 F.3d 333, 340 n. 8 (1st Cir.2001)(gross error, such as mistaking the defendant for someone else, might raise an issue of due process).

Moreover, a trial court has a practical duty, even though it may not be constitutionally compelled, to articulate its reasons for choosing a particular sentence, unless the basis for the sentencing determination is obvious from the record. *See United States v. Bennett,* 37 F.3d 687, 698 n. 16 (1st Cir.1994) ("[E]ven where there may ordinarily be no special requirement for a statement of reasons in making sentence determinations, cases . . . may present situations in which an explanation by the district court is as a practical matter essential . . . .").

■ Petitioner contends that this court, in formulating his sentence, miscalculated the amount of intended loss he was responsible for, and/or failed to articulate sufficiently clearly the basis for its calculation. Neither contention has any merit.

It is true that, as sometimes happens in cases of white collar crime, the subtlety of Petitioner's fraudulent scheme created a little difficulty in calculating the precise amount of intended loss. To understand this nuance, some background is necessary.

In concocting his fraud, Petitioner relied on the fact that insurers carefully analyze their insureds' past claims history to set the terms of prospective health insurance plans. This is particularly important in setting the "attachment point" for a medical insurance plan, which describes the level of expense that must be reached before the insurer becomes liable to cover health care costs. An attachment point of, for example, $300,000 would mean that the insurance company would be responsible for any claims in the coverage year above that amount. Petitioner's clients (including several small businesses, the Town of Williamstown, and Deerfield Academy) were, like many entities of their size, suffering huge increases in the costs of employee health coverage.

To impress his clients and to keep them as part of his business portfolio, Petitioner's covert solution to the problem of increasing health care coverage costs was to embroider a web of lies to the insurance company. He forged documents submitted to his clients' insurer, Continental Assurance Company ("CNA"), so that they grossly understated his clients' past medical claims history. These documents deceived the insurer into giving his clients artificially low attachment points, thereby containing their health care expenses dramatically.

Petitioner's fraud was eventually detected, and all or most of his clients suffered substantial, sometimes catastrophic, mid-year increases in health care costs when their true claims history was revealed and CNA's coverage was re-written under the policies' fraud provisions.

When Petitioner's scheme unraveled he responded with aggressive denials and false explanations. He later created phoney e-mails attempting to shift blame to his brother-in-law Richard Bradley for a forged letter of recommendation the government intended to attempt to offer against him.

At the sentencing hearing, the court determined the intended loss for purposes of the advisory guidelines was between $200,000 and $400,000, consistent with its findings at the conclusion of Petitioner's trial. (Hrg. Tr. 5, May 5, 2005.) The government vigorously objected, taking the position that the amount of intended loss was at a minimum $1,200,000. Despite the government's colorable argument, the court gave Petitioner the benefit of the doubt, noting that the higher intended loss amount advocated by the government was unlikely as a practical matter because the insurance companies "do keep an eye on the accumulating losses during the course of the year." (Hrg. Tr. 7:9–15.)

There can be no question that if CNA had been subject to the false attachment point based on the phoney documents Petitioner created, its losses would have greatly exceeded $400,000. It was only the quick eyes and determined work of CNA's underwriter, Joseph Rico, that caught the fact that so many of Petitioner's clients were submitting claims at a greatly increased rate over their supposed past history. Rico's alert professionalism brought the Petitioner's fraudulent conduct to light and rescued CNA from the train wreck it was heading for.

The challenge for the court at sentencing was to determine just how much loss Petitioner intended by his opportunistic scheme, since he could not have known the exact amount of future claims that would be submitted and possibly paid based on his forgeries.

The court acknowledged the difficulty of estimating an intended loss, but went on to say: "I don't want to make too much of the fact that there was no actual out-of-pocket loss [to CNA] here. There was an awful lot of damage." (Hrg. Tr. 11:23–25.) In light of the huge potential loss, the court, giving the Petitioner the benefit of every doubt, concluded that the intended loss could not have been any less than $350,000, the minimum amount of loss Petitioner surely would have known CNA would have suffered had his forgeries not been discovered. The loss calculation was reasonable under the circumstances and extremely fair to Petitioner. Indeed, if there is any complaint to be made about the imprecision of the court's calculation, it would more rightly be offered by the government.

It is well established that "intended loss does not have to be determined with precision; the court needs only to make a reasonable estimate in light of the available information." *United States v. Thurston,*

358 F.3d 51, 69 (1st Cir.2004) (citation omitted). The case law does not require that the intended loss be based on a finding that the defendant's scheme had a high likelihood of coming to fruition, only that it had "some prospect of success." *United States v. Orlando–Figueroa*, 229 F.3d 33, 38 (1st Cir.2000) (citation omitted).

In determining the intended loss in Petitioner's case, the court relied on the extensive findings of fact. These findings were conveyed orally to the Petitioner at the close of the trial on December 14, 2004, and their substance was repeated at the sentencing hearing on May 5, 2005. Petitioner has no basis for any claim for *habeas* relief arising either from the loss calculation itself or from any failure on the part of the court to make its reasoning clear.[1]

## B. *Exculpatory Evidence.*

"It is axiomatic that [*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] and its progeny established that a defendant has a due process right to request and receive evidence that the government possesses which is material to his guilt or punishment." *Olszewski v. Spencer*, 466 F.3d 47, 55 (1st Cir.2006) (citation omitted). When "the reliability of a given witness may well be determinative of guilt or innocence," a failure to disclose evidence affecting credibility may be material. *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). The court does not, however, "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (citation omitted). Withheld evidence may undermine a conviction only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," a "reasonable probability" here being one that is "sufficient to undermine confidence in the outcome." *Ellsworth v. Warden*, 333 F.3d 1, 4 (1st Cir.2003) (citation omitted).

■ Petitioner claims that the government withheld a document or documents mentioned as the "Nogeira [sic] letters" in an e-mail sent by United States Department of Labor Investigator J. Martin Shanahan to Assistant United States Attorney Karen Goodwin.[2] Beyond contending that the initials "RB" suggested that Richard Bradley, and not he, drafted the letter, Petitioner sheds no light on the contents of the letter or letters, or how this material might have affected the outcome of the trial. Petitioner simply states that "[h]ad these materials been provided to the Petitioner's Defense Counsel, said materials would have impeached the testimonies of Richard Bradley and Jack Nogueira." (Dkt. No. 37, Petitioner's Mem. of Law at 7.)

Even assuming the e-mail reference is sufficient to show that the government in fact possessed the letter, which is doubtful, Petitioner has the burden of showing that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The letter, assuming it existed

---

1. *United States v. Jones*, 475 F.3d 701 (5th Cir.2007), which Petitioner cites, offers him no assistance. There, the government relied only on the Pre–Sentence Report to establish the amount of loss. Here the court presided over a non-jury trial and personally heard the testimony of more than two dozen witnesses.

2. The exact nature this supposed letter is unclear. In its opposition to Petitioner's argument on this point, the government refers to "a letter purportedly signed by Jack Nogueira allegedly with the initials 'RB' next to the signature." (Dkt. No. 34, Resp. Brief at 11.)

and the government possessed it, would have done nothing to undercut Richard Bradley's emphatic and credible testimony that he never knew about the letter or had any role in drafting it. Since Petitioner has entirely failed to demonstrate any likely impact on the trial, the putative letter provides no ground for *habeas* relief.[3]

### C. Ineffective Assistance of Counsel.

In the original and amended petition, Petitioner claims that the performance of both his trial and appellate counsel was constitutionally deficient. "A criminal defendant claiming a Sixth Amendment ineffective assistance of counsel violation must establish that (1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been deficient.'" *Knight v. Spencer*, 447 F.3d 6, 16 (1st Cir.2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Petitioner bears the "heavy" burden of proving both prongs of this test. *Argencourt v. United States*, 78 F.3d 14, 16 (1st Cir. 1996). A petitioner's failure to satisfy one prong of the *Strickland* analysis eliminates the need for the court to consider the remaining prong. *Cf. Gonzalez–Soberal v. United States*, 244 F.3d 273, 277 (1st Cir. 2001).

Under the first prong of *Strickland*, there is a "strong presumption" that counsel's strategy and tactics fell "within the range of reasonable professional assistance," and that a court in assessing counsel's performance should make "every ef-

fort [to] eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. *Habeas* relief is appropriate "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Knight*, 447 F.3d at 16 (citations omitted).

Under the second prong, not all errors are sufficient to meet "the standard of a reasonable probability that, but for the counsel's errors, the result of the proceedings would have been different." *Id.* A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Smiley v. Maloney*, 422 F.3d 17, 20 (1st Cir.2005).

■ Petitioner's ineffective assistance arguments are far too vague to satisfy either prong. He first argues that his defense counsel failed to introduce an "entire book" of pre-marked exhibits.[4] Petitioner makes no effort to identify any exculpatory value in this box of exhibits other than its supposed tendency to establish some kind of unspecified alibi. His only effort at specificity is to claim that three of the documents, in some way, would have tended to exculpate him regarding improprieties relating to one of his clients, the Town of Williamstown. In sum, nothing submitted to the court comes close to suggesting that trial counsel erred in failing to introduce exhibits, or that the correction of her error, assuming one was committed, would have had even the slightest effect on the outcome of the trial.

---

3. This alleged *Brady* violation is the subject of Petitioner's Second Motion for a New Trial pursuant to Fed. R.Crim. Pro. 33, incorrectly filed in a closed case, 02–CR–30009–MAP. (Dkt. No. 190.) For the reasons stated, the court has denied this motion by marginal notation.

4. Petitioner also alleges that trial counsel often consumed alcoholic beverages during lunch and suffered from hangovers on some mornings. Petitioner's claim notwithstanding, there was no evidence during the lengthy trial that defense counsel's faculties were in any way impaired.

Petitioner next alleges that counsel should have introduced evidence regarding Petitioner's eye surgery, which he contends compromised his ability to use a computer and generate the forged materials. Given the overwhelming evidence at trial showing Petitioner's personal involvement in the preparation of many documents, the decision not to offer this evidence cannot be regarded as evidence of any ineffective assistance of counsel.

Petitioner also alleges that defense counsel failed to request the government turn over copies of "hard drives and disks," which he alleges contained exculpatory evidence. Again, any claim for ineffective assistance of counsel on this ground is meritless. First, Petitioner acknowledges that the government voluntarily produced much of this category of material. More importantly, Petitioner fails to identify any additional contents of the supposed drives or disks that would have had any exculpatory value.

Petitioner also argues that defense counsel failed to challenge the government's loss theory or to seek a downward departure on the basis of a lower intended loss than the one eventually found by the court. This argument is not supported by the facts. Defense counsel argued vigorously for a lower intended loss figure, submitting the evidence of a damages expert and offering extensive arguments both in her closing brief, (02–CR–30009–MAP, Dkt. No. 129), as well as in her sentencing memorandum (Dkt. No. 159). That the argument was successful is borne out by the fact that the court rejected the government's proposed intended loss figure of $1,200,000 and adopted the considerably lower amount of $350,000. Petitioner has no ground whatever for complaint regarding the effectiveness of his trial attorney in this area.

Petitioner finally argues that his appellate attorneys failed to raise all of the above-mentioned claims. "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Only when ignored issues are "clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (citation omitted). Many of the arguments offered by Petitioner could be characterized as, at best, barely short of frivolous. The decision made by well-qualified appellate counsel to prioritize Petitioner's strongest arguments, while it did not lead to reversal, reflected no professional deficiencies even approaching the level of ineffective assistance of counsel.

## III.  *CONCLUSION*

For the foregoing reasons, Petitioner's Motion to Vacate, Set Aside, or Correct Illegal Sentence pursuant to 29 U.S.C. § 2255 (Dkt. No. 1), as amended, is hereby DENIED. The clerk will enter judgment for Respondents. This case may now be closed.

It is So Ordered.